Affirmed by Supreme Court on January 12, 2000.

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

TOMMY DAVID STRICKLER,
Petitioner-Appellee,

v.

No. 97-29

SAMUEL V. PRUETT, Warden,
Mecklenburg Correctional Center,
Respondent-Appellant.

TOMMY DAVID STRICKLER,
Petitioner-Appellant,

v.

No. 97-30

SAMUEL V. PRUETT, Warden,
Mecklenburg Correctional Center,
Respondent-Appellee.

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert R. Merhige, Jr., Senior District Judge.
(CA-95-924-3)

Argued: March 6, 1998

Decided: June 17, 1998

Before NIEMEYER, HAMILTON, and LUTTIG, Circuit Judges.

_____

Affirmed in part, vacated in part, and remanded with instructions by
unpublished per curiam opinion. Judge Luttig wrote a separate state-
ment.

_____

**COUNSEL**

**ARGUED:** Pamela Anne Rumpz, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellant. Barbara Lynn Hartung, Richmond, Virginia, for Appellee. **ON BRIEF:** Richard Cullen, Attorney General of Virginia, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellant. Mark E. Olive, VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER, Richmond, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

The petitioner, Tommy David Strickler, applied for a writ of habeas corpus in the United States District Court for the Eastern District of Virginia following his conviction and death sentence for capital murder in the Circuit Court of Augusta County, Virginia. See 28 U.S.C. § 2254.**1** The district court granted the writ, reasoning that Strickler's rights under Brady v. Maryland, 373 U.S. 83 (1963), were violated when the prosecutor failed to disclose certain evidence at

_____

**1** Because Strickler's petition for writ of habeas corpus was filed prior to the April 24, 1996 enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, Pub. L. No. 104-132, 110 Stat. 1214, the Chapter 153 amendments of the AEDPA do not apply in this case. See Lindh v. Murphy, 117 S. Ct. 2059, 2068 (1997) (holding that the Chapter 153 amendments, amendments applying to all federal habeas petitions, do not apply to federal habeas petitions pending on the date of the AEDPA's enactment). As to the Chapter 154 amendments, amendments applying to capital petitioners, we need not decide whether these amendments apply in this case because Strickler's claims are either procedurally defaulted or meritless under the more lenient pre-existing standards. Indeed, we are confident the AEDPA is of no help to Strickler.

2

trial. The Commonwealth of Virginia (the Commonwealth), acting through one of its wardens, appeals this ruling. In his cross-appeal, Strickler appeals the district court's dismissal of his claim that the Virginia Supreme Court's proportionality review of his death sentence was constitutionally deficient. Although the district court correctly dismissed Strickler's proportionality review claim, the district court erred when it granted Strickler relief under Brady. Accordingly, we affirm in part, vacate in part, and remand with instructions to dismiss the petition.

I

In 1990, Strickler was convicted of, inter alia , the capital murder of Leanne Whitlock. As recounted by the Virginia Supreme Court on direct appeal, the facts surrounding Whitlock's murder are:

> On January 5, 1990, Leanne Whitlock (Leanne), a sophomore at James Madison University, borrowed a 1986 Mercury Lynx from her boyfriend, who worked at the Valley Mall in Harrisonburg. The car was clean at the time. Leanne left the Mall at 4:30 p.m. and, with her roommate, Sonja Lamb, drove to a store, where Leanne had a part-time job, to pick up a paycheck. Leanne dropped Sonja off about 6:45 p.m. and left, alone, to return the borrowed car to her boyfriend.
>
> Anne Stolzfus was in a store at Valley Mall with her daughter at 6:00 p.m. when Strickler, Ronald Henderson, and a blond woman entered. Strickler was behaving in such a loud, rude, and boisterous manner that she watched him with some apprehension. He was dressed in casual, but clean, clothing.
>
> As Mrs. Stolzfus was leaving the mall soon thereafter, she saw Leanne Whitlock driving the blue Mercury. Suddenly, Strickler ran out of the mall and addressed the occupant of a nearby van, angrily pounding on the van's door. Strickler also ran up to the occupants of a pick-up truck. He then turned to the Mercury that Leanne was driving, which was stopped in traffic, and pounded on the passenger side win-

3

dow. Leanne leaned over as if to lock the door, but Strickler wrenched the door open and jumped into the car, facing Leanne. She appeared to try to push him away, but he opened the door and beckoned Henderson and the blond woman to join him.

Leanne accelerated and began sounding blasts on the horn. Strickler struck her repeatedly and she ceased to sound the horn and stopped the car. Henderson and the blond woman entered the back seat. Mrs. Stolzfus came up to the car and asked, three times, "are you O.K.?" Leanne seemed "totally frozen." She drove the Mercury away very slowly, and mouthed the word, "help." The Mercury headed east on Route 33, toward Elkton. Mrs. Stolzfus' daughter wrote down its license number, West Virginia NKA 243.

About 7:30 p.m., Kurt D. Massie and a friend were driving north on Route 340 near Stuarts Draft. They saw a dirty blue car, southbound, turn off and drive into a field. Strickler was the driver, a white woman was in the front seat with him,[2] and another man was in the back seat. Massie thought he saw a fourth occupant in the car.

Between 9:00 and 9:15 p.m., Strickler and Henderson walked into Dice's Inn in Staunton. Strickler was wearing blue jeans which were dirty, bloody, and had a burn mark on them. He gave a wristwatch, later identified as the property of Leanne Whitlock, to a girl named Nancy Simmons.

At 12:30 or 1:00 a.m., Strickler left Dice's Inn with Henderson and a girl named Donna Tudor. The three entered a dirty blue Mercury. Henderson drove the car and Strickler sat in the back seat with Donna. Strickler told her he had bought the car from a man for $500. He also said that he had been in a fight and had injured his knuckle, which appeared to be lacerated. Strickler and Henderson discussed a "fight" they had had with "it," describing "it" with a racial epithet.

_____

[2] Leanne was black.

4

Strickler said they had kicked "it" in the back of the head and had used a "rock crusher." He said "it" would give them no more trouble. Strickler was calm during this conversation, but Henderson seemed nervous and kept looking over his shoulder at them. The three drove to Harrisonburg to purchase drugs. During the ride, Henderson nearly collided head on with an approaching car, and Strickler drew a knife and threatened to stab him.

After dropping Henderson off in Harrisonburg, Donna Tudor went to Virginia Beach with Strickler in the blue Mercury. The two stayed nearly a week, during which time Donna saw Leanne Whitlock's driver's license, identification card, and bank card in the car. Strickler tried to use the bank card in Virginia Beach, and gave Donna a pair of earrings which Leanne had worn on the night of January 5.

Several days later, Donna and Strickler returned to Strickler's mother's home in New Market. Strickler's mother washed his blood-stained blue jeans and his shirt.

Strickler told Donna to hide Leanne's three identification cards in a bag with his T-shirt and other clothing. She deposited these items in an abandoned car near Strickler's stepfather's house, but later led police to them.

On January 10 or 11, Donna and Strickler abandoned the blue Mercury near a church. Angry after an argument with Donna, Strickler cut up the interior of the car with his hunting knife and also jumped on the car's roof, leaving his footprints.

On January 13, Henderson's frozen wallet was found in the cornfield into which Kurt Massie had seen Strickler drive the blue Mercury on January 5. Later that day, police searched the field and found Leanne's frozen clothing in a pile near the place Henderson's wallet had been found. Leanne's nude, frozen body was found in a nearby wooded area, 300 feet from the highway, buried under two logs and

5

covered with leaves which had been deliberately packed around the logs.

Leanne's hands were extended over her head and crossed at the wrists. She had been dragged by the feet over the ground face down at or shortly after the time of her death, leaving long linear scratches on her upper body. There were lacerations and abrasions on the face, neck, and thighs, some consistent with kicking. Death was caused by four large, crushing, depressed skull fractures with lacerations of the brain. Brain tissue had exuded from the left front of the skull, and bone fragments were imbedded in the brain. Any one of the fractures could have been fatal, but death was not instantaneous.

Near the body, the police found a large rock, weighing 69 pounds, 4 ounces, which was stained with human blood in two places. Despite the very cold weather, the rock was not frozen to the ground.

Beside the rock, there were two indentations in the frozen ground, one four inches deep, the other less. Each indentation contained blood of Leanne's blood type, as well as human hair consistent with Leanne's in all respects. Human hairs were also found on Leanne's frozen clothing. They were Caucasian in origin, and matched Strickler's hair in all respects. Some of them had evidently been torn out of his head by the roots.

Two of the shoe impressions on the roof of the Mercury matched a shoe Strickler was wearing when he was arrested on January 11. Eighteen of his fingerprints, and nine of Donna Tudor's, were identified in the car. A jacket with Henderson's identification was found in the car. It bore at least four human blood stains. The shirt Strickler had been wearing on January 5 was recovered from the brown bag Donna had hidden. It bore stains from semen consistent with Strickler's, as well as human blood stains. Vaginal swabs taken from Leanne's body also showed the presence of semen, but its type was not identified.

6

Strickler v. Commonwealth, 404 S.E.2d 227, 230-32 (Va. 1991).

On February 27, 1990, Strickler was charged with grand larceny, robbery, and abduction in Rockingham County.**3** That same day, Strickler was indicted by an Augusta County grand jury for the robbery and abduction of Whitlock.**4** On April 23, 1990, Strickler was indicted by an Augusta County grand jury for the capital murder of Whitlock. Following a jury trial in Augusta County Circuit Court, Strickler was convicted of all three charges. The jury fixed Strickler's punishment at life imprisonment for the robbery and abduction convictions. In the bifurcated proceeding, the jury heard evidence in aggravation and mitigation of the capital murder conviction. Based upon findings of Strickler's future dangerousness and the vileness of the crime, the jury fixed Strickler's sentence at death. The trial court sentenced Strickler in accordance with the jury's verdicts.

Strickler appealed his convictions and sentences to the Virginia Supreme Court, and that court affirmed. See Strickler v. Commonwealth, 404 S.E.2d 227 (Va. 1991). On November 4, 1991, the Supreme Court of the United States denied Strickler's petition for writ of certiorari. See Strickler v. Virginia , 502 U.S. 944 (1991).

Strickler then sought state collateral relief in the Circuit Court for Augusta County. In September 1993, the circuit court dismissed Strickler's state habeas petition. The Virginia Supreme Court granted a limited appeal to address whether: (1) the state habeas court erred in refusing to vacate Strickler's capital murder conviction because of an erroneous capital murder jury instruction; and (2) his trial counsels' failure to object to the capital murder jury instruction rendered his trial counsels' performance constitutionally ineffective. The Virginia Supreme Court found the former claim procedurally defaulted under state law. See Strickler v. Murray, 452 S.E.2d 648, 651 (Va. 1995). As to the latter claim, the court found that Strickler was not prejudiced by the erroneous capital murder instruction and, therefore, failed to meet his burden of showing that, but for trial counsels' error,

_____

**3** Whitlock was abducted in Rockingham County, but murdered in Augusta County.
**4** As a result of the charges brought in Augusta County, the Rockingham charges were nolle prosequi.

7

the result of the proceeding would have been different. <u>See id.</u> at 652-53. On October 2, 1995, the Supreme Court of the United States denied Strickler's petition for writ of certiorari. <u>See Strickler v. Angelone</u>, 516 U.S. 850 (1995).

On March 5, 1996, Strickler filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of Virginia. On May 20, 1996, Strickler filed an amended petition. On January 16, 1997, the district court dismissed, among other claims, Strickler's claim concerning the Virginia Supreme Court's proportionality review of his death sentence.

Following discovery, Strickler moved for summary judgment on his <u>Brady</u> claim. In response, the Commonwealth filed a cross motion for summary judgment. On October 15, 1997, the district court granted Strickler's motion for summary judgment and denied the Commonwealth's cross-motion for summary judgment. The district court held that Strickler's constitutional rights were violated by the prosecutor's failure to disclose certain evidence at trial. The Commonwealth moved for a stay of the district court's judgment pending appeal, which the district court granted. Both Strickler and the Commonwealth noted timely appeals.

II

In the district court, Strickler contended that statements and letters written by Anne Stolzfus, a Commonwealth witness, as well as police reports contained in the Harrisonburg Police Department files,[5] contained exculpatory evidence which was required to be disclosed under <u>Brady</u>. The parties refer to this evidence as "the Stolzfus materials," and these materials appear as Exhibits one through eight to an affidavit submitted in the district court by William Bobbitt, Jr., one of Strickler's trial counsel. The district court concluded that Strickler's rights were violated under <u>Brady</u> and issued the writ on that basis.

For two reasons, the Commonwealth contends the district court erred in issuing the writ. First, the Commonwealth contends that the

_____

[5] Harrisonburg is located in Rockingham County.

8

Brady claim is procedurally defaulted and that Strickler has not established cause and prejudice to excuse the procedural default. Second, the Commonwealth contends that Strickler's Brady claim fails on the merits.

Strickler's Brady claim was never presented to the Virginia state courts. Strickler's failure to raise the claim in state court brings into play the doctrines of exhaustion and procedural default.

In the interest of giving the state courts the first opportunity to consider alleged constitutional errors occurring in a state prisoner's trial and sentencing, a state prisoner must exhaust all available state remedies before he can apply for federal habeas relief. See Matthews v. Evatt, 105 F.3d 907, 910-11 (4th Cir.), cert. denied, 118 S. Ct. 102 (1997); see also 28 U.S.C. § 2254(b). To exhaust state remedies, a habeas petitioner must fairly present the substance of his claim to the state's highest court. See Matthews, 105 F.3d at 911. The exhaustion requirement is not satisfied if the petitioner presents new legal theories or factual claims for the first time in his federal habeas petition. See id. The burden of proving that a claim is exhausted lies with the habeas petitioner. See Mallory v. Smith, 27 F.3d 991, 994 (4th Cir. 1994).

A distinct but related limit on the scope of federal habeas review is the doctrine of procedural default. If a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim. See Coleman v. Thompson, 501 U.S. 722, 731-32 (1991). A procedural default also occurs when a habeas petitioner fails to exhaust available state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." Id. at 735 n.1. We may excuse a procedural default if the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice." Id. at 750.**6**

_____

**6** Before this court, Strickler has not attempted to establish that our refusal to address his Brady claim would result in a "miscarriage of justice." Accordingly, we do not address the "miscarriage of justice" exception.

9

Under Virginia law, "a petitioner is barred from raising any claim in a successive petition if the facts as to that claim were either known or available to petitioner at the time of his original petition." Hoke v. Netherland, 92 F.3d 1350, 1354 n.1 (4th Cir.) (internal quotes omitted), cert. denied, 117 S. Ct. 630 (1996); Va. Code Ann. § 8.01-654(B)(2) ("No writ [of habeas corpus ad subjeciendum] shall be granted on the basis of any allegation the facts of which petitioner had knowledge at the time of filing any previous petition."). Thus, resolution of the question of whether Strickler's Brady claim is procedurally defaulted turns on whether the factual basis of Strickler's Brady claim was available to him at the time he filed his state habeas petition.

We begin our discussion with a summary of the facts surrounding Strickler's Brady claim. Prior to trial, Detective Dan Claytor of the Harrisonburg Police Department interviewed Stolzfus on approximately five occasions. Detective Claytor took notes during, and typed reports of, his interviews with Stolzfus and received letters and "summaries" from Stolzfus. These documents, referred to by the parties as the "Stolzfus materials," were kept in Harrisonburg Police Department files.

On the day before trial, an article appeared in the Roanoke Times containing an interview with an unidentified prosecution witness, obviously Stolzfus. In the interview, Stolzfus summarized the circumstances surrounding Whitlock's abduction. This summary tracked her eventual trial testimony and also revealed a fact not contained in her trial testimony: that she had contacted Whitlock's boyfriend and viewed photographs of Whitlock.

At trial, Stolzfus testified that she was interviewed by Detective Claytor on several occasions and described Whitlock's abduction to a reporter from the Roanoke Times approximately one week prior to the trial. Stolzfus also testified that she had identified Strickler in a photo line-up.

As to the circumstances surrounding Whitlock's abduction, Stolzfus testified that on January 5, 1990, she went to the Valley Mall in Harrisonburg with her daughter. Around 6:00 p.m., they entered the Music Land store where she saw two men and a blond woman. One of the men was "revved up" and impatient. She described the physical

10

features of the three and their clothing. After Stolzfus left the store, she again encountered the trio inside the Valley Mall and spoke briefly to the woman. Shortly thereafter, Stolzfus and her daughter got into their car and stopped in the Valley Mall parking lot when a car came by. The driver was a black woman. Stolzfus described her as a "rich college kid," "beautiful," "well dressed," "happy," "singing," and "bright eyed." Stolzfus testified she got a good look at her and identified the driver as Whitlock.

Whitlock pulled in front of Stolzfus and stopped for traffic. The "revved up" man from the music store, whom Stolzfus later identified as Strickler, came out of the Valley Mall and banged on vehicles in front of Whitlock's car. He then pounded on Whitlock's passenger side window, yanked the car door open, and sat facing her. She tried to push him away. The second man and the blond woman, seen earlier in the Valley Mall, tried to enter the car also. Whitlock accelerated and "laid on the horn." Strickler hit Whitlock repeatedly on her shoulder and head. When the car stopped, Strickler opened the passenger door, and the other two got into the backseat. The second man, later identified as Henderson, handed his coat to Strickler who put it on the floor and "fiddled with it [for] what seemed like a long time."

Stolzfus pulled parallel to Whitlock's car, got out, and walked over to look. Henderson "laid over on the seat to hide from" Stolzfus. Stolzfus returned to her car, faced Whitlock, and then asked her three times "are you O.K." Each time Whitlock looked at Stolzfus and then down to her right. Whitlock mouthed a word that Stolzfus did not understand. She then realized that Whitlock had said"help." Stolzfus pulled away and told her daughter to go inside the Valley Mall and get security. The daughter refused. Whitlock drove past Stolzfus very slowly, "went up over the curb . . . so the car really tilted," and "laid on the horn again." Stolzfus told her daughter to write the license number down on an index card. Stolzfus remembered the plate, West Virginia NKA 243, with a trick, "No Kids Alone 243."**7**

_____

**7** For reasons not entirely clear from the record, Stolzfus did not report the incident to law enforcement. However, the record does reflect that Stolzfus was approached by Detective Claytor after she had told a fellow classmate at James Madison University about the January 5, 1990 incident and her classmate informed law enforcement.

On state habeas, Strickler did assert an ineffective assistance of counsel claim based on counsels' failure to file a <u>Brady</u> motion, although it is unclear from the record what formed the factual basis for this claim. The Commonwealth opposed the motion on the basis that Strickler received all <u>Brady</u> material through the prosecutor's open file policy. However, Strickler did not request to examine the police files of the Harrisonburg Police Department, notwithstanding Stolzfus' trial testimony that she was interviewed by Detective Claytor on several occasions and Virginia Supreme Court Rule 4:1(b)(5) which allows, with prior leave of court, discovery on all relevant matters that are not privileged.

On federal habeas, Strickler served interrogatories and subpoenaed documents from various police and prosecution files. Pursuant to a subpoena, Strickler obtained the Stolzfus materials from the Harrisonburg Police Department files. Pursuant to another subpoena, Strickler obtained all materials concerning Stolzfus in the current custody of the Augusta County Commonwealth's attorney's office. The prosecutor's file contained Exhibits two, seven, and eight, but did not contain Exhibits one and three through six.**8**

_____

**8** There is a dispute between the parties concerning which exhibits were disclosed to Strickler prior to trial. In response to Strickler's interrogatories, Lee Ervin, the prosecutor in Strickler's case, stated that he reviewed only Exhibits two, seven, and eight and had never reviewed Exhibits one and three through six prior to Strickler's trial. Ervin also stated that Exhibits two, seven, and eight were in his prosecution file and were disclosed to defense counsel pursuant to the open file policy. Bobbitt stated in his affidavit that he had never seen any of the Stolzfus materials prior to, or during, Strickler's trial, notwithstanding the open file policy. Similarly, Humes J. Franklin, Jr., Henderson's trial counsel, stated in his affidavit that he had no recollection of seeing any of the Stolzfus materials in Ervin's files. However, Thomas Roberts, Strickler's other trial counsel, stated in his affidavit that, although he could not recall if he had seen the Stolzfus materials, he did recall the "information contained in them." Roberts also stated that he had discussed with Bobbitt the "possibility that Ms. Stolzfus may not be a credible witness because she had not come forward immediately and her story had become much more detailed over time." According to Roberts, "[i]t seemed too good to be true." The district court never resolved this dispute because the district court concluded that even if Exhibits two, seven, and eight were dis-

12

As noted above, the Stolzfus materials appear as Exhibits one through eight to an affidavit submitted in the district court by Bobbitt. Exhibit one is a one-page document containing Detective Claytor's hand-written notes of his initial January 19, 1990 interview with Stolzfus. The notes reveal that Stolzfus could not identify Whitlock; could identify the blond woman; and indicated that Henderson was tall, had black hair, and wore a cream colored jacket. Exhibit two is a six-page, typed report of Detective's Claytor's interviews with Stolzfus on January 19 and 22, 1990. The report contains a detailed summary of Stolzfus' account of Whitlock's abduction. However, Detective Claytor's report notes that Stolzfus was not sure if she could identify Strickler and Henderson, although Stolzfus indicated she might if she saw Strickler and Henderson in person. Exhibit two also notes that Stolzfus was taken to the police impound lot on January 24, 1990, and shown the car Whitlock had been driving. According to the report, the next day Stolzfus advised police that she now recalled the license number, NKA 243, and "had made up a code to help remember the license number after the incident,`No Kids After 243.'"

Exhibit three entitled "Observations" was given to Detective Claytor by Stolzfus on January 19, 1990, at 1:00 p.m. In this exhibit, Stolzfus describes the abduction with a set of diagrams.

Exhibit four is a typed letter, dated January 22, 1990, to Detective Claytor signed by Stolzfus. In this letter, Stolzfus explains that although she did not initially remember being at the Valley Mall on the evening Whitlock was abducted, her memory was "jogged" when her daughter reminded her of a small purchase at a shop in the Valley Mall. In this exhibit, Stolzfus also explains that she was uncertain about portions of the events she witnessed the evening of Whitlock's abduction:

_____

closed to Strickler, his rights under <u>Brady</u> were violated. We need not decide this factual dispute because, as discussed <u>infra</u>, Strickler's <u>Brady</u> claim is procedurally defaulted; Strickler has not established cause and prejudice to excuse the default; and the claim is, in any event, without merit.

13

I have a very vague memory that I'm not sure of. It seems as if the wild guy that I saw had come running through the door and up to a bus as the bus was pulling off. I have impressions of intense anger, of his going back to where the dark haired guy and girl were standing. Then the guy I saw came running up to the black girl's window? Were those 2 memories the same person? . . .

Exhibit five is an undated, typed document entitled"Notes for Detective Claytor: My Impressions of the Car." In this exhibit, Stolzfus gives a description of the car driven by Whitlock, but does not mention the license plate or the license plate number.

Exhibit six is a hand-written note to Detective Claytor from Stolzfus dated January 25, 1990, 1:45 a.m. In this note, Stolzfus reports that she spent several hours with Whitlock's boyfriend viewing photographs and was certain Whitlock was the black girl she saw on January 5, 1990.

Exhibit seven is a typed two-page letter dated January 26, 1990, to Detective Claytor and signed by Stolzfus. This letter contains a description of Stolzfus' encounter with Strickler, Henderson, and the blond woman at the music store in the Valley Mall.

Exhibit eight is a three-page, typed document, undated and signed by Stolzfus. The document is entitled "Details of Encounter with Mountain Man, Shy Guy and Blond Girl." This exhibit contains a detailed description of Stolzfus' encounter with Strickler, Henderson, and the blond woman in the Valley Mall and of Whitlock's abduction. The summary of Whitlock's abduction in this exhibit essentially mirrors her trial testimony and the facts set forth in the Roanoke Times article.[9]

We are of the opinion that the factual basis of Strickler's Brady claim was available to him at the time he filed his state habeas petition and, therefore, the Brady claim is procedurally defaulted under the authority of Hoke and Va. Code Ann.§ 8.01-654(B)(2). Strickler,

_____

[9] The Roanoke Times article was produced by the Commonwealth as an exhibit in its cross-motion for summary judgment.

14

of course, knew that Stolzfus was interviewed by Detective Claytor on several occasions and had identified Strickler in a photo line-up. In light of these facts, reasonably competent counsel would have sought discovery in state court in order to examine the Harrisonburg Police Department files concerning Stolzfus' statements to Detective Claytor. Upon such a simple request, it is likely the state court would have ordered the production of the files. In other words, in state court, Strickler could have followed a procedure similar to the one he followed in federal court: Strickler could have filed a discovery motion seeking to review the Harrisonburg police files, see Va. S. Ct. Rule 4:1(b)(5) (extending discovery, with prior leave of court, to all matters that are relevant and not privileged). His failure to do so results in a procedural default of his Brady claim.

Having concluded that Strickler's Brady claim would be procedurally defaulted if he attempted to raise it in state court at this time, we can only address Strickler's Brady claim if he can demonstrate cause and actual prejudice. See Coleman, 501 U.S. at 750. Objective factors that constitute cause include "'interference by officials' that makes compliance with the State's procedural rule impracticable, and 'a showing that the factual or legal basis for a claim was not reasonably available to counsel.'" McClesky v. Zant, 499 U.S. 467, 493-94 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)); see also Clanton v. Muncy, 845 F.2d 1238, 1241 (4th Cir. 1988). Additionally, the novelty of a claim has been held to constitute cause. See Reed v. Ross, 468 U.S. 1, 12-16 (1984); see also Dugger v. Adams, 489 U.S. 401, 407 (1989) (stating that cause may be established upon demonstration that a constitutional claim is "so novel that its legal basis is not reasonably available to counsel"). Finally, a petitioner may establish cause by showing he received constitutionally ineffective assistance of counsel. See Coleman, 501 U.S. at 753; Murray, 477 U.S. at 488.**10**

_____

**10** Generally, "a claim of ineffective assistance [must] be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." Murray , 477 U.S. at 489; see also Pruett v. Thompson, 996 F.2d 1560, 1570 (4th Cir. 1993). This is so because allowing a petitioner to raise a claim of ineffective assistance of counsel for the first time on federal habeas review in order to show cause for a procedural default would place the federal habeas court "in the

15

Strickler asserts that the factual basis for his Brady claim was unavailable to him at the time he filed his state habeas petition and, therefore, he has established cause for the procedural default. But, as noted above, Strickler's Brady claim was available to him in state court through the exercise of reasonable diligence. As such, he cannot establish cause based upon the unavailability of the Brady claim. See Stockton v. Murray, 41 F.3d 920, 925 (4th Cir. 1994) ("Even if [the petitioner] had not actually raised or known of the claims previously, he still cannot establish cause to excuse his default if he should have known of such claims through the exercise of reasonable diligence.").

Strickler also argues that his trial counsel were constitutionally ineffective for failing to make a Brady motion at trial. If attorney error amounts to constitutionally ineffective assistance of counsel under the standard established in Strickland v. Washington, 466 U.S. 668 (1984), the Sixth Amendment dictates that the attorney's error must be imputed to the state. See Coleman, 501 U.S. at 754. Accordingly, Strickler may establish cause to excuse his procedural default by showing trial counsel error that satisfies the standard set forth in Strickland. See id. at 752. Under Strickland, a defendant is deprived of the assistance of counsel guaranteed by the Constitution when counsel's performance falls "below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 694.

In this case, Strickler's trial counsels' action did not fall below an objective standard of reasonableness. In light of the prosecutor's open file policy, trial counsel were under no obligation to file a Brady motion. Cf. Smith v. Maggio, 696 F.2d 365, 367 (5th Cir. 1983) ("Counsel had no duty to file pre-trial motions, because the prosecutor established an open file policy that made filing of discovery motions or Brady requests pointless.").

_____

anomalous position of adjudicating an unexhausted constitutional claim for which state court review might still be available" in contravention of "[t]he principle of comity that underlies the exhaustion doctrine." Murray, 477 U.S. at 489. Strickler has satisfied this requirement by presenting an ineffective assistance of counsel claim based on trial counsels' failure to file a Brady motion to the state court on state habeas.

16

Even if we were to agree with Strickler that cause exists to excuse his procedural default, Strickler cannot establish prejudice. To establish "actual prejudice," Strickler "must shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982); Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir.), cert. denied, 118 S. Ct. 595 (1997).

Under Brady and its progeny, the prosecution's failure to disclose "evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." United States v. Ellis, 121 F.3d 908, 914 (4th Cir.) (quoting Brady, 373 U.S. at 87), cert. denied, 118 S. Ct. 738 (1998); accord Kyles v. Whitley, 514 U.S. 419, 431 (1995). However, evidence is material "only where there exists a `reasonable probability' that had the evidence been disclosed the result of the trial would have been different." Ellis, 121 F.3d at 914 (quoting Wood v. Bartholomew, 516 U.S. 1, 5 (1995)). A "reasonable probability" of a different result is shown when the government's failure to disclose evidence "undermines confidence in the outcome of the trial." Kyles, 514 U.S. at 434.

In our view, the Stolzfus materials would have provided little or no help to Strickler in either the guilt or sentencing phases of the trial. During either phase, Strickler never contested that he abducted and robbed Whitlock. In fact, counsel for Strickler argued to the jury during the guilt phase that they should convict Strickler of first degree murder rather than capital murder because Henderson, rather than Strickler, actually killed Whitlock. Thus, Stolzfus' testimony was not critical to the Commonwealth's case, especially in view of the overwhelming evidence in the record, independent of Stolzfus' testimony, demonstrating that Strickler abducted and robbed Whitlock. During the sentencing phase, Stolzfus' testimony was of no import. For the future dangerousness aggravating circumstance, the parties focused their arguments on Strickler's prior criminal record, which included approximately eleven prior convictions. As to the vileness predicate, although the prosecutor did state the uncontested fact that Whitlock was abducted, the focal point of his argument was on the use of the sixty-nine pound boulder to crush and fracture Whitlock's skull. In

17

short, the failure to disclose any or all of the Stolzfus materials does not undermine our "confidence in the outcome of the trial." Id.

In summary, Strickler's Brady claim is procedurally defaulted and he has failed to establish cause and prejudice to excuse the default. Accordingly, the district court erred when it granted the writ on Strickler's Brady claim.[11]

III

In his cross-appeal, Strickler contends that the Virginia Supreme Court's proportionality review of his death sentence was constitutionally inadequate. In response, the Commonwealth contends that this claim is procedurally defaulted and that Strickler has not established cause to excuse the procedural default. Alternatively, the Commonwealth argues that the claim is without merit.

Strickler presented this claim for the first time in his state habeas petition and it was found to be procedurally defaulted under the authority of Slayton v. Parrigan, 205 S.E.2d 680 (Va. 1974). In Slayton, the Virginia Supreme Court held that claims that could have been raised at trial or on direct appeal but were not cannot be considered on collateral review. Id. at 682. The district court held that Strickler's proportionality review claim was procedurally defaulted under Slayton and that Strickler failed to establish cause and actual prejudice to excuse the default.

Absent cause and actual prejudice or a miscarriage of justice,[12] a federal habeas court may not review constitutional claims when a state court has declined to consider their merits on the basis of an adequate and independent state procedural rule. See Harris v. Reed, 489

---

[11] Even if we could get beyond the threshold question of procedural default, for the same reasons why Strickler cannot demonstrate prejudice to excuse the procedural default of his Brady claim, Strickler's Brady claim fails on the merits.

[12] Because Strickler has not attempted to establish that our refusal to address his procedurally defaulted proportionality review claim would result in a miscarriage of justice, we do not address the miscarriage of justice exception.

18

U.S. 255, 262 (1989). Such a rule is adequate if it is regularly or consistently applied by the state court, see Johnson v. Mississippi, 486 U.S. 578, 587 (1988), and is independent if it does not "depend[ ] on a federal constitutional ruling," Ake v. Oklahoma, 470 U.S. 68, 75 (1985).

Under federal habeas law, we are not at liberty to question a state court's application of a state procedural rule because a state court's finding of procedural default is not reviewable if the finding is based upon an adequate and independent state ground. See Harris, 489 U.S. at 262; Barnes v. Thompson, 58 F.3d 971, 974 n.2 (4th Cir. 1995). Because Slayton is an independent and adequate state ground, we can consider only whether cause and prejudice exists to excuse the procedural default, not whether the state court correctly applied its own law. See Harris, 489 U.S. at 262.

Strickler contends that he has established cause because he was unable to raise his proportionality review claim until after the Virginia Supreme Court conducted such a review and subsequently affirmed his sentence on direct review. We disagree.

As noted earlier, objective factors that constitute cause include "`interference by officials' that makes compliance with the State's procedural rule impracticable, and `a showing that the factual or legal basis for a claim was not reasonably available to counsel.'" McClesky, 499 U.S. at 493-94 (quoting Murray, 477 U.S. at 488). Findings of the state court supporting its decision to apply the state procedural default rule are entitled to a presumption of correctness in determining whether cause exists to excuse a procedural default. See 28 U.S.C. § 2254(d); Sumner v. Mata, 449 U.S. 539, 547 (1981); Stockton, 41 F.3d at 924.

An issue before the Virginia Supreme Court on direct appeal was whether Strickler's death sentence was "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." See Va. Code Ann.§ 17-110.1(C)(2). Obviously, Strickler was free to assert, and the Virginia Supreme Court was free to entertain, a facial challenge to all proportionality review in the Commonwealth of Virginia on direct appeal, prior to the Virginia Supreme Court's proportionality review. Furthermore, Strickler was

19

free to assert, and the Virginia Supreme Court was free to entertain, an as-applied challenge to the proportionality review that he received on direct appeal in a rehearing petition to the Virginia Supreme Court. In fact, Strickler filed a petition for rehearing, but did not challenge the Virginia Supreme Court's proportionality review of his death sentence. Accordingly, Strickler has not met his burden of "'showing that the factual or legal basis for [the proportionality review] claim was not reasonably available to counsel,'" McClesky, 499 U.S. at 494 (quoting Murray, 477 U.S. at 488), and, therefore, has failed to establish cause to excuse the procedural default.**13**

IV

For the reasons stated herein, the judgment of the district court is affirmed in part, vacated in part, and remanded with instructions to dismiss the petition.

AFFIRMED IN PART, VACATED IN PART,
AND REMANDED WITH INSTRUCTIONS

LUTTIG, Circuit Judge:

Appellee/cross-appellant Tommy Strickler has filed a motion that I be disqualified from participation in the decision of this case pursuant to 28 U.S.C. § 455. (On different grounds, counsel for Strickler

_____

**13** Even if we were able to get past the threshold question of procedural default, Strickler would not be entitled to relief. First, it is well-settled that no proportionality review is constitutionally mandated. See Pulley v. Harris, 465 U.S. 37, 50-51 (1984). As we stated in Petersen v. Murray, 904 F.2d 882 (4th Cir. 1990), "this court may not issue a writ of habeas corpus on the ground that the [Virginia] Supreme Court has made an error of state law." Id. at 887 (citation and internal quotes omitted). See also Buchanan v. Angelone, 103 F.3d 344, 351 (4th Cir. 1996) (stating that claim that proportionality review was inadequate cannot form the basis of federal habeas corpus relief), aff'd , 118 S. Ct. 757 (1998). Second, we have examined the proportionality review conducted by the Virginia Supreme Court, see Strickler v. Commonwealth, 404 S.E.2d at 237, and we cannot conclude that Strickler has been denied any federal constitutional right, if one were to exist, to adequate and meaningful proportionality review.

20

earlier sought, and was denied, recusal of the state habeas judge.). As grounds for disqualification, Strickler's counsel, Barbara L. Hartung and Mark E. Olive, cite the "unavoidable parallels" between the murder of my dad and the murder of Leanne Whitlock for which Strickler stands convicted. The Commonwealth opposes the motion for the reasons stated in its response.

The circumstances surrounding my dad's murder are so different from those surrounding the murder of Leanne Whitlock that, in my judgment, no one, except those who believe I should not sit in any murder case because my dad was the victim of a murder, could, on this ground, reasonably question my ability to sit impartially on the panel deciding this case. Moreover, the legal issues presented in this appeal have no counterpart whatever in any of the proceedings involving those who murdered my dad. Accordingly, the motion is denied.

My dad was murdered in the driveway of his home in Tyler, Texas, during a carjacking, at approximately 11:00 p.m. on April 19, 1994 -- more than four years ago now. Upon exiting his vehicle in the garage, my dad was confronted by three armed, black youths, and shot twice in the head with a .45 caliber weapon. A single shot was fired at my mother, but she was not struck. The three perpetrators left my parents' home immediately. No personal items, other than the car, were stolen from my dad or my mother. Nothing was stolen from the interior compartments of my parents' car. At trial, it was shown that the three youths who murdered my dad had contemplated, and actually attempted, other carjackings in the immediately preceding days and that they had, on the night of the murder, followed my mother and dad to their home, having the purpose and intent of stealing my parents' vehicle. Although the three who murdered my dad were black, there was no testimony presented of either racial motivation or racial animus. Two of the three youths were convicted in federal court on carjacking charges and in state court on murder charges. The third was convicted of capital murder in state court.

There are few parallels between the circumstances of my dad's murder and the circumstances of Leanne Whitlock's murder, and those that do exist are the most general in nature-- for example, that three perpetrators were involved and that they stole a vehicle. Leanne

21

Whitlock was a black female, and a sophomore at James Madison University when she was murdered. Whitlock was forcibly abducted from a shopping mall parking lot in the early evening hours by Strickler, a white adult male, and two white adult companions.

The three forced Whitlock to drive to a distant cornfield, where she was apparently raped, and then killed with a 69-pound boulder. Id. at 231. According to the Virginia Supreme Court, whose findings in this particular regard are not before us for review:

> Leanne's hands were extended over her head and crossed at the wrists. She had been dragged by the feet over the ground face down at or shortly after the time of her death, leaving long linear scratches on her upper body. There were lacerations and abrasions on the face, neck, and thighs, some consistent with kicking.

Id. The Virginia Supreme Court affirmed that Whitlock's "[d]eath was caused by four large, crushing, depressed skull fractures with lacerations to the brain. Brain tissue had exuded from the left front of the skull, and bone fragments were embedded in the brain." Id. Whitlock's nude, frozen, buried body was subsequently found in the field by authorities. Again according to the Virginia Supreme Court, the shirt worn by Strickler the night of the murder "bore stains from semen consistent with Strickler's, as well as human bloodstains. Vaginal swabs taken from Leanne's body also showed the presence of semen, but its type was not identified." Id . at 231-32. Said the court:

> Prior to [Whitlock's] murder, the victim had been abducted by strangers, was terrified and called for help, was driven to a deserted field, was dragged, struggling, out of her car, was stripped naked, beaten, kicked, and sexually assaulted.

Id. at 237.

After the murder, Strickler and his codefendant discussed, in the presence of a third person, a fight they had had with a "nigger," id. at 231; Strickler said they had kicked the "nigger" in the back of the head, had used a "rock crusher," and that the "nigger" would give

22

them no more trouble. Id. Strickler, his codefendant, and the third person then drove back to the town where the murder occurred "to purchase drugs." Id.

Strickler was indicted for robbery of not only Whitlock's vehicle, but also other of her personal property, including her wristwatch, earrings, and bank card. Id. at 230-31. Although Strickler was indicted and apparently convicted for robbery of Whitlock's vehicle, it is unclear whether Whitlock's vehicle was stolen principally for the value of the car itself or instead as a get-away vehicle; the suggestion is that the latter was the purpose. See Strickler v. Commonwealth, 404 S.E.2d 227, 230 (Va. 1991) ("Suddenly, Strickler ran out of the mall and addressed the occupant of a nearby van, angrily pounded on the van's door. Strickler also ran up to the occupants of a pick-up truck. He then turned to the Mercury Leanne was driving, which was stopped in traffic, and pounded on the passenger side window.").

Apart from the dissimilarity of the circumstances between my dad's murder and Whitlock's murder, to my knowledge the issues presented by this appeal under Brady v. Maryland, 373 U.S. 83 (1963), bear no resemblance in any respect to any of the issues raised by any of those convicted of my dad's murder in any of their proceedings to date. Indeed, insofar as I am aware, there has never been raised an issue of changing eye-witness testimony or the improper withholding of exculpatory evidence in any of the appeals from the convictions for my dad's murder.

Against the backdrop of the factual and legal dissimilarities between my dad's murder and the appeals from the ensuing convictions on the one hand, and Leanne Whitlock's murder and the instant appeal on the other, the natural inference arises that the present disqualification motion has been filed not because my dad was the victim of a murder, but, rather, because I am the author of three, and I joined a fourth, of this Circuit's authorities which Strickler's counsel could have reasonably surmised might bear upon the disposition of the appeals sub judice. See Barnes v. Thompson, 58 F.3d 971 (4th Cir. 1995) (Luttig, J.), cert. denied, 116 S. Ct. 4351 (1995); Hoke v. Netherland, 92 F.3d 1350 (4th Cir.) (Luttig, J.), cert. denied, 117 S. Ct. 630 (1996); In re Netherland, No. 97-8 (4th Cir. Apr. 10, 1997) (Luttig, J., single Circuit Judge) (staying district court's ex parte grant

23

of pre-petition discovery to state prisoner); <u>In re Pruett</u>, 133 F.3d 275 (4th Cir. 1997) (Hall, J., joined by Luttig and Motz, JJ.).

Because of the time that has elapsed since my dad's murder; the dissimilarity of the circumstances surrounding my dad's and Leanne Whitlock's murders; and the lack of any overlap in the legal issues presented in the appeals of the two cases, I do not believe that it can reasonably be maintained either that I cannot impartially sit in judgment of this appeal or that my impartiality can fairly be questioned. Nor, any more than recusal from discrimination cases should be required by judges who themselves, or whose families, have been subjected to invidious racial or sexual discrimination, do I believe that my recusal is required from this and all other murder cases for the reason alone that my dad was the victim of a murder.

The purpose of section 455 is not to require recusal from the courts of all who have experienced the fullness of life-- good and bad; and certainly its purpose is not to enable forum shopping by parties to litigation. Rather, its purpose is only to ensure that the matters before the courts are decided by a judiciary that is impartial both in fact and in appearance. I do not believe that this indisputably important purpose is, in any way, compromised or disserved by my participation in this case. As I have earlier stated in open court, capital defendants are entitled to fair and impartial consideration of their claims by me when I am randomly selected to serve on the panel hearing their cases. Neither before nor after my dad's murder have they received less.

24