# Thomas David Strickler

## v.

# Commonwealth of Virginia

Record Nos. 901391 and 901392

April 19, 1991

Present: Carrico, C.J., Stephenson, Russell, Whiting, Lacy, and Hassell, JJ.,
and Poff, Senior Justice

*William E. Bobbitt, Jr. (Thomas E. Roberts*, on brief), for appellant.

H. Elizabeth Staffer, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

JUSTICE RUSSELL delivered the opinion of the Court.

In these appeals, we review a capital murder conviction and a death penalty imposed upon Thomas David Strickler, together with convictions for robbery and abduction.

## I. PROCEEDINGS

Strickler was tried upon indictments charging robbery, abduction, and capital murder, Code § 18.2-31. At the first stage of a bifurcated jury trial conducted pursuant to Code §§ 19.2-264.3 and -264.4A, Strickler was found guilty as charged in all three indictments. The jury fixed his punishment at life imprisonment for each of the two non-capital offenses. At the penalty phase of the capital murder trial, after hearing evidence in aggravation and mitigation, the jury found both the "future dangerousness" and the "vileness" predicates to be present and unanimously fixed Strickler's punishment at death for capital murder. After considering a probation officer's report and conducting a sentencing hearing, the court, by final order entered on September 19, 1990, entered judgment on the jury's verdicts.

We have consolidated Strickler's appeal of the capital murder conviction in Record No. 901391 with the automatic review of his death sentence to which he is entitled, Code § 17-110.1A and -F, and have given them priority on our docket, Code § 17-110.2. We have also certified Strickler's appeals of his robbery and abduction convictions, Record No. 901392, from the Court of Appeals, and have consolidated the two records for our consideration.

## II. THE EVIDENCE

We will review the evidence in the light most favorable to the Commonwealth.

On January 5, 1990, Leanne Whitlock (Leanne), a sophomore at James Madison University, borrowed a 1986 Mercury Lynx from her boyfriend, who worked at the Valley Mall in Harrisonburg. The car was clean at the time. Leanne left the mall at 4:30 p.m. and, with her roommate, Sonja Lamb, drove to a store, where Leanne had a part-time job, to pick up a paycheck. Leanne

dropped Sonja off about 6:45 p.m. and left, alone, to return the borrowed car to her boyfriend.

Anne Stolzfus was in a store at Valley Mall with her daughter at 6:00 p.m. when Strickler, Ronald Henderson, and a blond woman entered. Strickler was behaving in such a loud, rude, and boisterous manner that she watched him with some apprehension. He was dressed in casual, but clean, clothing.

As Mrs. Stolzfus was leaving the mall soon thereafter, she saw Leanne Whitlock driving the blue Mercury. Suddenly, Strickler ran out of the mall and addressed the occupant of a nearby van, angrily pounding on the van's door. Strickler also ran up to the occupants of a pick-up truck. He then turned to the Mercury Leanne was driving, which was stopped in traffic, and pounded on the passenger side window. Leanne leaned over as if to lock the door, but Strickler wrenched the door open and jumped into the car, facing Leanne. She appeared to try to push him away, but he opened the door and beckoned Henderson and the blond woman to join him.

Leanne accelerated and began sounding blasts on the horn. Strickler struck her repeatedly and she ceased to sound the horn and stopped the car. Henderson and the blond woman entered the back seat. Mrs. Stolzfus came up to the car and asked, three times, "are you O.K.?" Leanne seemed "totally frozen." She drove the Mercury away very slowly, and mouthed the word, "help." The Mercury headed east on Route 33, toward Elkton. Mrs. Stolzfus' daughter wrote down its license number, West Virginia NKA 243.

About 7:30 p.m., Kurt D. Massie and a friend were driving north on Route 340 near Stuarts Draft. They saw a dirty blue car, southbound, turn off and drive into a field. Strickler was the driver, a white woman was in the front seat with him,* and another man was in the back seat. Massie thought he saw a fourth occupant in the car.

Between 9:00 and 9:15 p.m., Strickler and Henderson walked into Dice's Inn in Staunton. Strickler was wearing blue jeans which were dirty, bloody, and had a burn mark on them. He gave a wristwatch, later identified as the property of Leanne Whitlock, to a girl named Nancy Simmons.

---

* Leanne was black.

At 12:30 or 1:00 a.m., Strickler left Dice's Inn with Henderson and a girl named Donna Tudor. The three entered a dirty blue Mercury. Henderson drove the car and Strickler sat in the back seat with Donna. Strickler told her he had bought the car from a man for $500. He also said that he had been in a fight and had injured his knuckle, which appeared to be lacerated. Strickler and Henderson discussed a "fight" they had had with "it," describing "it" with a racial epithet. Strickler said they had kicked "it" in the back of the head and had used a "rock crusher." He said "it" would give them no more trouble. Strickler was calm during this conversation, but Henderson seemed nervous and kept looking over his shoulder at them. The three drove to Harrisonburg to purchase drugs. During the ride, Henderson nearly collided head-on with an approaching car, and Strickler drew a knife and threatened to stab him.

After dropping Henderson off in Harrisonburg, Donna Tudor went to Virginia Beach with Strickler in the blue Mercury. The two stayed nearly a week, during which time Donna saw Leanne Whitlock's driver's license, identification card, and bank card in the car. Strickler tried to use the bank card in Virginia Beach, and gave Donna a pair of earrings which Leanne had worn on the night of January 5.

Several days later, Donna and Strickler returned to Strickler's mother's home in New Market. Strickler's mother washed his bloodstained blue jeans and his shirt.

Strickler told Donna to hide Leanne's three identification cards in a bag with his T-shirt and other clothing. She deposited these items in an abandoned car behind Strickler's stepfather's house, but later led police to them.

On January 10 or 11, Donna and Strickler abandoned the blue Mercury near a church. Angry after an argument with Donna, Strickler cut up the interior of the car with his hunting knife and also jumped on the car's roof, leaving his footprints.

On January 13, Henderson's frozen wallet was found in the cornfield into which Kurt Massie had seen Strickler drive the blue Mercury on January 5. Later that day, police searched the field and found Leanne's frozen clothing in a pile near the place Henderson's wallet had been found. Leanne's nude, frozen body was found in a nearby wooded area, 300 feet from the highway, buried under two logs and covered with leaves which had been deliberately packed around the logs.

Leanne's hands were extended over her head and crossed at the wrists. She had been dragged by the feet over the ground face down at or shortly after the time of her death, leaving long linear scratches on her upper body. There were lacerations and abrasions on the face, neck, and thighs, some consistent with kicking. Death was caused by four large, crushing, depressed skull fractures with lacerations of the brain. Brain tissue had exuded from the left front of the skull, and bone fragments were imbedded in the brain. Any one of the fractures could have been fatal, but death was not instantaneous.

Near the body, the police found a large rock, weighing 69 pounds, 4 ounces, which was stained with human blood in two places. Despite the very cold weather, the rock was not frozen to the ground.

Beside the rock, there were two indentations in the frozen ground, one four inches deep, the other less. Each indentation contained blood of Leanne's blood type, as well as human hair consistent with Leanne's in all respects. Human hairs were also found on Leanne's frozen clothing. They were Caucasian in origin and matched Strickler's hair in all respects. Some of them had evidently been torn out of his head by the roots.

Two of the shoe impressions on the roof of the Mercury matched a shoe Strickler was wearing when he was arrested on January 11. Eighteen of his fingerprints, and nine of Donna Tudor's, were identified in the car. A jacket with Henderson's identification was found in the car. It bore at least four human bloodstains. The shirt Strickler had been wearing on January 5 was recovered from the brown bag Donna had hidden. It bore stains from semen consistent with Strickler's, as well as human bloodstains. Vaginal swabs taken from Leanne's body also showed the presence of semen, but its type was not identified.

## III.  ISSUES PREVIOUSLY DECIDED

Strickler's appeal raises a number of legal issues which are resolved by our previous decisions. Because we adhere to the views expressed in those cases, we will not discuss them beyond giving citations to representative cases in which those issues were decided adversely to Strickler's claims. The issues raised here which have been previously and expressly rejected are:

A. The death penalty constitutes cruel and unusual punishment. *Spencer* v. *Commonwealth*, 240 Va. 78, 84, 393 S.E.2d 609, 613, *cert. denied*, 498 U.S. ____, 111 S.Ct. 281 (1990) (*Spencer IV*).

B. The defendant should have been furnished a daily transcript. *Martin* v. *Commonwealth*, 221 Va. 436, 446, 271 S.E.2d 123, 130 (1980).

C. The defendant should have been given additional peremptory challenges. *Spencer IV*, 240 Va. at 84, 393 S.E.2d at 613.

D. The defendant should have been permitted to question veniremen as to what a life sentence meant to them. *Eaton* v. *Commonwealth*, 240 Va. 236, 248, 397 S.E.2d 385, 392 (1990); *Spencer IV*, 240 Va. at 85, 393 S.E.2d at 613.

E. The court should have prohibited the questioning of veniremen with respect to their views on the death penalty. *Eaton*, 240 Va. at 246, 397 S.E.2d at 391.

F. The defendant should have been permitted to ask veniremen whether they would "be able to grant mercy" to one convicted of capital murder. *Frye* v. *Commonwealth*, 231 Va. 370, 394, 345 S.E.2d 267, 283-84 (1986).

## IV. JURY QUESTIONNAIRE

Three weeks before trial, Strickler submitted to the court a two-page "Juror's Personal Data Questionnaire" and moved the court to order each venireman to complete and return it before trial. The court denied the motion and noted that some of the questions on the questionnaire were impermissible and that others could be answered by reference to an information sheet returned by all prospective jurors.

The trial court ruled correctly. Strickler's argument in favor of the questionnaire was that it would "save some time" at *voir dire*. As laudable as that aim might be, we think the use of a pretrial questionnaire would pursue it at too high a price. We observed in *Pope* v. *Commonwealth*, 234 Va. 114, 123-24, 360 S.E.2d 352, 358 (1987), *cert. denied*, 485 U.S. 1015 (1988), that "the trial judge has the opportunity, which we lack, to observe and evaluate the apparent sincerity, conscientiousness, intelligence, and demeanor of prospective jurors first hand." For that reason, we entrust to trial judges wide judicial discretion in deciding the sensitive question whether a challenged prospective juror "stand[s] indifferent in the cause," Code § 8.01-358, and we will not disturb the exercise of that discretion unless "manifest error

appears in the record." *Pope*, 234 Va. at 124, 360 S.E.2d at 358. To the extent a pretrial juror questionnaire would probe a juror's attitudes outside the courtroom, it would detract from the trial judge's "opportunity . . . to observe and evaluate . . . prospective jurors first hand." In our view, the opportunity to see and hear the veniremen, when questioned during *voir dire*, is crucial to the effective discharge of the trial judge's responsibility.

## V. MOTION FOR A BILL OF PARTICULARS

Strickler filed a pretrial motion for a bill of particulars, which the court denied. Strickler assigns error to the court's denial of three parts of the motion, *i.e.*:

A. To identify the grounds, and all of them, on which [the Commonwealth] contends that defendant is guilty of capital murder under Virginia Code Sect. 18.2-31, as amended, 1950.

B. To identify the evidence, and all of it, upon which it intends to rely in seeking a conviction of defendant upon the charge of capital murder.

D. To identify the evidence, and all of it, on which it intends to rely in support of the aggravating factors identified, and all other evidence which it intends to introduce in support of its contention that death is the appropriate punishment for this defendant.

■ The trial court correctly denied the motion. No challenge is made to the sufficiency of the indictments. To be sufficient, an indictment must give the accused "notice of the nature and character of the offense charged so he can make his defense." *Wilder v. Commonwealth*, 217 Va. 145, 147, 225 S.E.2d 411, 413 (1976). When an indictment meets that standard, as the indictments here do, a bill of particulars is not required. *Ward v. Commonwealth*, 205 Va. 564, 569, 138 S.E.2d 293, 296-97 (1964); *Tasker v. Commonwealth*, 202 Va. 1019, 1024, 121 S.E.2d 459, 462-63 (1961).

■ Parts B and D of Strickler's motion are sweeping demands for pretrial disclosure of all the Commonwealth's evidence to be introduced at both the guilt and penalty phases of the trial. There

is no general constitutional right to discovery in a criminal case, even where a capital offense is charged. *Spencer v. Commonwealth*, 238 Va. 295, 303, 384 S.E.2d 785, 791 (1989), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1171 (1990) (*Spencer II*). Limited discovery is permitted in criminal cases by the Rules of Court. *Id.*; Rule 3A:11. Strickler had the benefit of all the discovery to which he was entitled under the Rules. Those rights do not extend to the general production of evidence, except in the limited areas prescribed by Rule 3A:11.

■ On appeal, Strickler cites *Brady v. Maryland*, 373 U.S. 83 (1963), and *United States v. Agurs*, 427 U.S. 97 (1976), with regard to a criminal defendant's right to the production of *exculpatory* evidence. Those cases are inapposite because Strickler's motion sought only the production of evidence which would tend to convict him at the guilt phase and tend to support the imposition of capital punishment at the penalty phase.

## VI. VOIR DIRE

### A. Prospective Jurors Kwolek, Almarode, and Wills

Strickler assigns error to the trial court's exclusion of three prospective jurors for cause. Karl J. Kwolek was asked if he had any beliefs that would impair his ability to convict a defendant of a crime which potentially carried the death penalty. He responded, "I do not believe in the death penalty." He flatly stated that he would not convict a defendant of such a crime, despite what the evidence might show.

Madeline H. Almarode stated that she did not think she could convict a defendant of a crime which could result in a death penalty. She further stated that she would not vote to impose the death penalty despite what the evidence might show.

Larry J. Wills stated that he would not vote to impose the death penalty "under any circumstances." He reiterated that he would not vote for the death penalty regardless of any instructions the court might give.

■ The court correctly excluded all three prospective jurors for cause. Each freely stated views that "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *O'Dell v. Commonwealth*, 234 Va. 672, 695, 364 S.E.2d 491, 504, *cert. denied*, 488

U.S. 871 (1988) (quoting *Adams* v. *Texas*, 448 U.S. 38, 45 (1980)).

## B. Prospective Jurors Ramsey and Brooks

Strickler assigns error to the trial court's refusal to exclude two prospective jurors for cause. John H. Ramsey had served as a chief probation and parole officer for many years, but had retired long before this trial. He had prepared many presentence reports, including, on one occasion, a report on a defendant who received the death penalty. He stated unequivocally that he would not be affected "at all" by his past involvement with a capital case and would follow the court's instructions.

■ The court determined that Mr. Ramsey would be impartial and there is nothing in the record supporting any challenge to that determination. If a prospective juror has no knowledge of the facts of the case and demonstrates impartiality, he is not subject to a challenge for cause merely because he has had an association with law enforcement personnel. *Clozza* v. *Commonwealth*, 228 Va. 124, 129, 321 S.E.2d 273, 276 (1984), *cert. denied*, 469 U.S. 1230 (1985).

Buryle G. Brooks was asked if he had any beliefs that would prevent or impair his ability to follow the court's instructions on the presumption of innocence and the defendant's right not to testify. He replied, "What the Bible says, an eye for [an] eye and a tooth for a tooth." The court immediately asked him, "No[,] but I mean, I'm talking about the presumption of innocence. You would presume that he would be innocent?" Mr. Brooks responded, "Right." The court then asked, "If I told you that he doesn't have to testify and you can't hold it against him, would you follow that instruction?" Again, Mr. Brooks said, "Right." In response to other questions, Mr. Brooks stated that he would follow the court's instructions and not substitute his own judgment as to what he thought the law was or ought to be.

■ Upon consideration of the entire *voir dire*, we find no evidence of an abuse of discretion in the court's decision to overrule the challenge. There is ample support in the record for the court's conclusion that the juror would be impartial. *See Pruett* v. *Commonwealth*, 232 Va. 266, 281, 351 S.E.2d 1, 10 (1986), *cert. denied*, 482 U.S. 931 (1987) (challenge must be decided on entire *voir dire*, not upon juror's isolated statement); *see also Pope*, 234 Va. at 123-24, 360 S.E.2d at 358 (trial court's discretion

respected because of judge's opportunity to observe juror first hand).

## C.   Prospective Juror Moyers

After the court had seated twenty prospective jurors and three alternate jurors who had been found free of exception pursuant to Code § 8.01-357, and while counsel were making their peremptory strikes, one of the prospective jurors, Donald E. Moyers, informed the court that his mother-in-law was being admitted to the hospital and that he might later wish to be excused. Strickler moved to excuse the juror and proceed with a panel of eleven. The court denied the motion, and impanelled twelve jurors.

██ The court observed that if circumstances should subsequently warrant excusing Mr. Moyers, an alternate juror could be sworn as a replacement. The court's ruling correctly applied Code §§ 19.2-262(2) (twelve persons from panel of twenty constitute jury in felony case) and 8.01-360 (alternate juror may replace juror excused for good cause during trial).

## VII.   JURY INSTRUCTIONS

### A.   Instructions A, B, AA, and 1

Strickler assigns error to the court's refusal of his tendered instructions A and B and its granting, in lieu thereof, the Commonwealth's tendered instructions AA and 1. Instruction A stated:

> The Court instructs the jury that the evidence must establish beyond a reasonable doubt that the defendant was the person who killed LeAnn [sic] Whitlock before you can find him guilty of capital murder. One who is present, aiding and abetting the actual killing, but who does not perform the killing, is a principle [sic] in the second degree and may not be found guilty of capital murder.

Refusing Instruction A, the court granted Instruction AA, the first paragraph of which was nearly identical to the refused instruction. The granted instruction, however, contained the following additional paragraph:

> You may find the defendant guilty of capital murder if the evidence establishes that the defendant jointly participated in

the fatal beating, if it is established beyond a reasonable doubt that the defendant was an active and immediate participant in the act or acts that caused the victim's death.

Strickler's refused Instruction B was a finding instruction requiring the Commonwealth to prove "[t]hat the defendant was *the person* who actually delivered *the blow* that killed Leanne Whitlock." (Emphasis added.) Instead, the court granted Commonwealth's Instruction 1, which required the Commonwealth to prove, *inter alia*:

"(1) That the defendant killed Leanne Whitlock; and

(2) That the killing was willful, deliberate and premeditated . . . ."

The Commonwealth's theory of the case was that Strickler and Henderson had acted jointly to accomplish the actual killing. It contended at trial, and argues on appeal, that the physical evidence points to a violent struggle between the assailants and the victim, in which Strickler's hair had actually been torn out by the roots. Although Leanne had been beaten and kicked, none of her injuries would have been sufficient to immobilize her until her skull was crushed with the 69-pound rock. Because, the Commonwealth's argument goes, the rock had been dropped on her head at least twice, while she was on the ground, leaving two bloodstained depressions in the frozen earth, it would have been necessary that she be held down by one assailant while the other lifted the rock and dropped it on her head.

The weight and dimensions of the 69-pound bloodstained rock, which was introduced in evidence as an exhibit, made it apparent that a single person could not have lifted it and dropped or thrown it while simultaneously holding the victim down. The bloodstains on Henderson's jacket as well as on Strickler's clothing further tended to corroborate the Commonwealth's theory that the two men had been in the immediate presence of the victim's body when the fatal blows were struck and, hence, had jointly participated in the killing.

Strickler's tendered instructions are based upon what he calls the "triggerman" theory of capital murder, *viz.*, the rule that except in the case of murder for hire, only the actual perpetrator of

the killing may be convicted. *See Cheng* v. *Commonwealth*, 240 Va. 26, 42, 393 S.E.2d 599, 607 (1990).

In *Coppola* v. *Commonwealth*, 220 Va. 243, 256-57, 257 S.E.2d 797, 806 (1979), *cert. denied*, 444 U.S. 1103 (1980), however, we held that a defendant who "jointly participated in [a] fatal beating" was subject to conviction and punishment for capital murder, where the other requisite elements were present. We adhere to the view that where two or more persons take a direct part in inflicting fatal injuries, each joint participant is an "immediate perpetrator" for the purposes of the capital murder statutes. *Id.* at 257, 257 S.E.2d at 807.

*Cheng* is inapposite. There, the victim had been killed by four shots from an automatic pistol. The evidence was sufficient to establish that the defendant had been present with others at the scene of the killing, and that he had participated at least as a principal in the second degree. The evidence was insufficient, however, to support the inference that the defendant had fired the fatal shots. *Cheng*, 240 Va. at 43, 393 S.E.2d at 608. Further, in contrast to the present case, there was no evidence in *Cheng* to support an inference that the fatal wounds had been inflicted by two or more persons acting jointly.

Strickler's tendered instructions were premised upon the theory that the killing was accomplished by a sole perpetrator. We find no evidence of record sufficient to support that theory. The Commonwealth's instructions were premised upon a theory of joint participation. Because there was substantial evidence to support Instruction AA, which subsumed Instruction A, and because the instructions given fully comport with the law of Virginia, the court's rulings were correct.

### B.   Instructions 6 and 7

Strickler assigns error to the court's granting Instruction 6, which told the jury that malice could be "inferred from any deliberate wilful and cruel act against another, however sudden," and Instruction 7, which stated that the jury "may infer malice from the deliberate use of a deadly weapon unless, from all the evidence, you have a reasonable doubt as to whether malice existed." Citing *Sandstrom* v. *Montana*, 442 U.S. 510 (1979), Strickler argues that these instructions either established an unconstitutional conclusive presumption against him or had an impermissible burden-shifting effect.

We considered and rejected the same argument in *R.B. Smith v. Commonwealth*, 239 Va. 243, 263-64, 389 S.E.2d 871, 882, *cert. denied*, 498 U.S. ___, 111 S.Ct. 221 (1990), and we adhere to that ruling.

## VIII.  SUFFICIENCY OF THE EVIDENCE

### A.  Guilt Phase

Strickler's argument that the evidence was insufficient to show that he was the actual perpetrator of the killing is substantially the same as the argument made in support of his tendered Instructions A and B, *supra*. He says that the evidence is consistent with a murder committed by a single perpetrator, and that it furnishes no basis for an inference that *he* was the perpetrator.

We do not agree. Strickler could have been convicted on the testimony of Donna Tudor alone. His jeans had been clean when he was at the shopping center, but when he entered Dice's Inn later that evening, they were dirty and bloody. His shirt contained human blood and traces of his semen. Semen was found in the victim's body. His knuckle had been visibly injured, and he said he had injured it in a "fight." He said that the victim had been "kicked in the head" so " 'it' wouldn't give them any more trouble." He said he and Henderson had used a "rock crusher."

Strickler's hair, torn out by the roots, was found near the victim's body on the clothing which had been removed from her. The victim was last seen alive in his presence — his abduction of her was reported by an eyewitness. He was seen entering the field in which her body was found. Her identification cards and credit cards remained in his possession after the killing. He left the scene in the car he had taken from her and, in a transparent falsehood, said that he had bought it. The evidence was amply sufficient to support Strickler's conviction as a joint perpetrator of the murder.

### B.  Penalty Phase

#### 1.  Future Dangerousness

At the penalty phase of the trial, the jury heard evidence of Strickler's continuing criminal activity. In his six years as an adult, he had accumulated convictions for eight felonies and twelve misdemeanors. In 1984, he had been convicted of statutory burglary, petit larceny, and tampering with a vending machine. In

a plea agreement, he agreed to serve fourteen months in jail with six months suspended. The following year, 1985, he received a federal conviction for passing counterfeit money. In 1986, he was convicted of two counts of grand larceny, two counts of statutory burglary, and one count of petit larceny. Pursuant to a plea agreement, he was sentenced to seven years in the penitentiary with five years suspended. In 1987, he received another federal conviction for the receipt of a firearm while a convicted felon. He was also found guilty of violation of his federal probation.

Most significantly, the jury had before it Strickler's violent behavior before and during the commission of the present crime, his boastful manner in describing it, his contemptuous references to the victim, his threat to kill Henderson, his violent behavior when angered by Donna Tudor, his callous attempt to profit by the use of Leanne's bank card, and his total lack of remorse. We hold that the evidence was more than sufficient to support the jury's finding of "future dangerousness."

## 2. Vileness

Strickler argues that the evidence is insufficient to support a finding of "vileness" because the circumstances indicate that the victim was probably rendered unconscious by the first blow to her head with the rock. We held in *Boggs v. Commonwealth*, 229 Va. 501, 521, 331 S.E.2d 407, 421 (1985), *cert. denied*, 475 U.S. 1031 (1986), that "[f]or purposes of the 'vileness' determination, it is immaterial whether the decedent remained conscious during the course of several assaults." Strickler's victim's skull was crushed by a rock in four places. Two of the blows were of such force that they left deep indentations in the frozen ground. Prior to the murder, the victim had been abducted by strangers, was terrified and called for help, was driven to a deserted field, was dragged, struggling, out of her car, was stripped naked, beaten, kicked, and sexually assaulted. She was forced to "experience the horror of waiting for [her] execution[.]" *James Dyral Briley v. Commonwealth*, 221 Va. 563, 579, 273 S.E.2d 57, 67 (1980). These circumstances meet the statutory criteria for findings of both physical and mental torture, depravity of mind, and aggravated battery beyond the minimum necessary to accomplish the act of murder. *See Bunch v. Commonwealth*, 225 Va. 423, 442, 304 S.E.2d 271, 282, *cert. denied*, 464 U.S. 977 (1983).

## IX. PASSION, PREJUDICE, AND PROPORTIONALITY

██ Code § 17-110.1C requires us to review the death sentence on the record to consider and determine:

1.  Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and
2.  Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

We have accumulated the records of all capital murder cases reviewed by this Court, pursuant to Code § 17-110.1E. After considering those records, we conclude that Strickler's sentence of death was neither excessive nor disproportionate to sentences generally imposed by other sentencing bodies in Virginia for comparable or similar crimes. *See, e.g., Spencer* v. *Commonwealth*, 238 Va. 295, 319-20, 384 S.E.2d 785, 800 (1989), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1171 (1990) (*Spencer II*) (compiling cases). Additionally, nothing in the record suggests that the death penalty was imposed under the influence of passion, prejudice, or any other arbitrary factor.

## X. CONCLUSION

We find no reversible error among the issues presented by Strickler's appeals. Having reviewed the sentence of death pursuant to Code § 17-110.1, we decline to set it aside. Accordingly, we will affirm the judgments in both cases.

Record No. 901391 - *Affirmed.*
Record No. 901392 - *Affirmed.*