COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, O'Brien and Fulton
Argued at Alexandria, Virginia

JULIE M. BEAVERS

v.      Record No. 1721-23-4

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE RANDOLPH A. BEALES
FEBRUARY 11, 2025

FROM THE CIRCUIT COURT OF STAFFORD COUNTY
Michael E. Levy, Judge

Elena Kagan, Assistant Public Defender (Catherine French
Zagurskie, Chief Appellate Counsel; Virginia Indigent Defense
Commission, on briefs), for appellant.

C. David Sands, III, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General; Collin Chayce Crookenden, Assistant
Attorney General, on brief), for appellee.

Following a jury trial, the Circuit Court of Stafford County convicted Julie M. Beavers of

reckless driving, in violation of Code § 46.2-862. On appeal, Beavers argues that the evidence

was insufficient to support her conviction. She also argues that the trial court erred in failing to

strike Juror 23 for cause and further erred in refusing to modify or suspend the jury's

recommended sentence.

I. BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, [as] the prevailing party at trial." *Gerald v.

Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381

(2016)). "This principle requires us to 'discard the evidence of the accused in conflict with that of

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

A. *Voir Dire*

At the beginning of *voir dire*, the trial judge asked the prospective jurors several questions "to determine whether any of you are so situated that it would be difficult for you to hear the evidence, the arguments and the instructions of the Court and to render a fair and impartial decision in this case." The prospective jurors all indicated that they had no personal interest in the outcome of the case, that they had not obtained any information about the alleged offense, that they had not already expressed or formed an opinion about Beavers's guilt or innocence, and that they were unaware of any biases or prejudices against the parties. They also indicated that they understood that Beavers was presumed innocent, that Beavers was not required to produce any evidence, and that the Commonwealth had to prove Beavers's guilt beyond a reasonable doubt. In addition, the prospective jurors indicated that they knew of no reason why they could not be fair and impartial to the parties.

The attorney for the Commonwealth then asked the prospective jurors several questions. The prospective jurors reiterated that they could be fair and impartial, that they had no religious, moral, or philosophical issues with rendering judgment of another, and that they understood that the Commonwealth was required to prove Beavers's guilt beyond a reasonable doubt. After explaining that the trial judge would instruct the prospective jurors on the law at the close of the evidence, the prosecutor asked the prospective jurors if they could apply the law to the facts of the case even if they disagreed with the law. The prospective jurors all indicated that they could.

Beavers's trial counsel also questioned the prospective jurors. The prospective jurors acknowledged that Beavers had a right to a jury trial and that she had the right not to testify at

trial. When asked if they had "a positive opinion of law enforcement," multiple jurors, including Juror 23, indicated that they did. Beavers's trial counsel then asked those prospective jurors if they "might be more likely to believe testimony from a law enforcement witness," and multiple jurors, including Juror 23, raised their hands in affirmation. Beavers's trial counsel did not ask any follow-up questions to the prospective jurors on that topic.

During a private bench conference, the trial judge asked Juror 23, "[D]o you feel that if a witness in this case is a police officer, you will believe that witness's testimony simply because he is a police officer without critically evaluating those other factors that you ought to consider in determining whether that's [sic] testimony is worthy of your belief?" Juror 23 responded, "I am a police officer. I think I could follow the evidence and weigh their testimony as much as anybody else's." The attorney for the Commonwealth then commented, "So, if a law enforcement officer testifies, it would be your duty as a juror to evaluate that law enforcement officer's credibility the same way you would any other witness." Juror 23 replied, "Yes." Beavers's trial counsel then asked Juror 23, "Do you believe that a law enforcement witness is inherently more credible than a civilian witness?" Juror 23 twice responded, "No." When asked by Beavers's trial counsel if he could set aside his experience as a law enforcement officer, Juror 23 stated, "Yes." The trial court denied Beavers's motion to strike Juror 23 for cause.[1]

### B. The Guilt Phase of the Jury Trial

Lieutenant D.T. Diggs of the Stafford County Sheriff's Office testified at Beavers's jury trial "as an expert in visual estimation of speed." Lieutenant Diggs testified that on April 4, 2022, he was driving along White Oak Road in his unmarked patrol vehicle when he noticed a black Mustang as he was turning onto Bethel Church Road. He recounted, "So initially, as I'm turning, I see a black [M]ustang and the rear of the vehicle squats, which indicates to me that the

---

[1] Juror 23 was ultimately seated on the jury.

vehicle is accelerating at a fast rate of speed." He recalled that "[t]he vehicle then moved into the opposing lane of traffic and from there adjusted to the center of the road and then back into the correct lane of travel." He noted that the Mustang (which was the only other vehicle on the road at that time) passed an unobstructed road sign indicating that the posted speed limit on Bethel Church Road was 45 miles per hour.

Lieutenant Diggs began to follow the Mustang. He testified, "I immediately respond by increasing in speed, talking over the radio, I have a reckless driver." He then described the process of "pacing" (or trying to keep up with) the Mustang, stating:

> I increased the speed of my vehicle to catch up with the vehicle. When I am behind the vehicle and I looked down at my speedometer, we're doing 114. We maintain, it's increasing, we go up to 118. The last time that I looked at my speedometer, so I want to remind you that this is a two lane road. It's pretty dangerous at this speed. For a slight second, we're at 120 that was the last time that I looked down. And right after we hit 120 Ms. Beavers, I believe at that point, [she] saw my lights and slammed on her [brakes].

Lieutenant Diggs reiterated, "I remember looking down, observing 120 on the speedometer. And as soon as we hit that speed, is when she starts to apply her brakes pretty heavily and then we stop."[2] He explained that he had attempted to maintain a distance of one-tenth of a mile behind Beavers's vehicle to properly pace her, but he could not say for certain how closely he had followed her because he was trying to match her increasing speed. He noted that from the time the pursuit began to the time Beavers stopped her vehicle, the two had travelled "about a little less than a quarter of a mile" for "a minute, two minutes tops."

Lieutenant Diggs then approached the Mustang, and he asked the driver (who was later determined to be Beavers), "[I]s there any reason that I shouldn't take you to jail?" Beavers

---

[2] At trial, the Commonwealth entered into evidence certificates of calibration for the speedometer and the radar tuning fork on the unmarked patrol vehicle that Lieutenant Diggs was driving when he initiated a traffic stop on Beavers's Mustang.

"advised that her son was having a mental health episode and she apologized for her speed." Lieutenant Diggs testified, "I asked her to show me what's going on. She showed me a Facebook message from the day prior but had nothing to show me that there was any concern at that moment or that day." He went on to testify, "I then asked her if she would like for me to send fire and rescue to her residence or if she would like for me to send a unit to her residence and she declined both." Beavers told Lieutenant Diggs that she felt that emergency services "would escalate the situation." Lieutenant Diggs noted that "[w]hen one of the deputies arrived on scene he corroborated that there had been some issues at the house previously with her son." He explained to Beavers that her son's mental health episode "wasn't an excuse for her to drive that way," and he "told her before she left that we would remain in the area. And so if she got home and there was a problem to call us."

After the Commonwealth presented its evidence, Beavers's trial counsel moved to strike, arguing, "I don't believe there's sufficient evidence for the jury to find beyond a reasonable doubt, even in the light most favorable to the Commonwealth to find what specific speed she is traveling." The trial court denied the motion to strike, finding that Lieutenant Diggs's testimony

> clearly established for purposes of the motion to strike that it was more than 20 over the 45 mile an hour speed limit. And for that matter, definitely in excess of 85 miles per hour, as well as the fact that the 45 had been posted and that she would have passed that posting unobstructed before he encountered her.

Beavers did not present any evidence in her defense, and her trial counsel renewed his motion to strike. Surmising that Lieutenant Diggs had "other things on his mind" during the traffic stop like "his safety, Ms. Beavers' safety, the safety of the community in general," Beavers's trial counsel asserted that Lieutenant Diggs's testimony regarding the time and distance traveled as he was pacing Beavers's vehicle could not have matched the speeds that Lieutenant Diggs described during his testimony. Beavers's trial counsel maintained that there

- 5 -

was not "sufficient evidence as far as consistency of speed and as far as consistent distance between cars." The trial court denied the renewed motion to strike, finding that "[a]s far as the conduct of the case, it is a question for the jury." After hearing the evidence and argument from counsel, the jury convicted Beavers of misdemeanor reckless driving.

### C.  The Sentencing Phase of the Jury Trial

During the sentencing phase before the jury, Beavers testified that her son (who was then 28 years old) was diagnosed with bipolar disorder when he was 19 years old and that "he's been hospitalized six times since then." She explained that on April 4, 2022, she was at a Dollar General store when she received a Facebook message from her niece "because of something my son had posted, a continuation of posts and which is normally how we find out that he's not taking his medication." She then stated, "I left the food that was in my cart, got in my car and I rushed home as quick as I could because he had been suicidal." Beavers testified, "I do not know the rate of speed I was going," and she maintained that she pulled over as soon as she saw Lieutenant Diggs in her rearview mirror.

Noting that Lieutenant Diggs's testimony about the traffic stop was accurate, Beavers testified that she told Lieutenant Diggs, "I need to get to my son." She stated that Lieutenant Diggs "offered to have like another officer go out or a [sic] call fire and rescue," but she asserted that "[i]t exacerbates the situation with my son when he sees an officer." Beavers claimed that after she got home, she tried to administer medication to her son and to take him to the hospital, but he refused. She then recounted, "My son later that night got the keys from out of my purse and he drove down to 95 to Richmond, where he was picked up walking on 95 on the interstate. He was hospitalized at VCU and he spent nine days there."

During her testimony, Beavers acknowledged, "I feel like I was wrong to speed." However, she stated, "I don't even know how fast I was going." She further stated,

> I regret speeding like I did, but I just don't think — I was obviously going too fast. I mean, I just don't think I was going as fast as I was. But like I said, my mind — I was in mother mode, mother bear who needed to go protect her child.

She also told the jury that she had experienced several health and work-related issues over the past two-and-a-half years. Her trial counsel presented a certificate showing that before trial, Beavers "did complete an aggressive driving course in recognition that she was going faster than she should have been."

The Commonwealth submitted certified copies of Beavers's prior driving convictions and her Department of Motor Vehicles driver's history record, which showed prior convictions for driving under the influence, driving on the wrong side of the road, driving with defective equipment, and failing to obey traffic signs. The attorney for the Commonwealth then argued that, although "the Commonwealth wholly understands and appreciates the severity of having a family member with a mental health issue," Beavers's reckless driving "put other people's lives at risk." The attorney for the Commonwealth pointed to Beavers's poor driving record and her prior convictions for driving-related offenses to show that "[t]his is a pattern. It's not just this isolated incident of I was worried so I drove home that fast. You don't drive 120 miles an hour on a two lane road when you're worried." The Commonwealth asked the jury to sentence Beavers to a period of active incarceration and to impose a fine.

In response, Beavers's trial counsel acknowledged that Beavers had driven too fast, but he emphasized that Beavers

> testified as to why she did what she did and she testified to the fact that she would never want to put anyone in danger but that what she was thinking about in that moment was getting home to her son because he had been suicidal and was experiencing a mental health episode.

He further emphasized that "[n]o one got hurt." Beavers's trial counsel asked the jury to impose a fine of $1,000 on Beavers, but not to sentence her to any period of active incarceration. After

deliberation, the jury recommended a sentence of 5 months of active incarceration and a $1,250 fine.

### D. The Trial Court's Sentencing

At the sentencing hearing before the trial court, Beavers's trial counsel submitted documentation showing that Beavers's son was hospitalized in April 2022. He then proffered that Beavers has two elderly parents who live in Tazewell County, Virginia, and that her son now resides with them. He noted that Beavers had recently sold her home in Stafford County and that she intended to move to Tazewell County "to be with her family to take care of her obligations down there." In addition, although Beavers was not currently employed, she had scheduled a job interview. Beavers's trial counsel asserted that "justice is not served by imposing active incarceration in this case," and he asked the trial court to suspend the entirety of any active jail sentence that it might impose. In response, the attorney for the Commonwealth argued that Beavers's case presented "extremely aggravated circumstances" and that "it's probably one of the highest speeds that's ever been in front of the Court at 120 miles an hour." He stated that "it would be highly appropriate to impose the sentence the jury gave." In allocution, Beavers apologized for speeding and reiterated that she was trying to get to her son, but she contended that "the Commonwealth makes light of my son's situation and it's not acceptable."

Before pronouncing the sentence, the trial judge told Beavers, "The Court certainly doesn't make light of your son's situation." The trial judge pointed out, however, that "the document you showed him [Lieutenant Diggs] at that time to support that reason for the incredible speed was actually something that had been posted previous to that and not even that day." The trial judge also pointed out that "we have the medical record which is dated the next day and of course, has the [a]llusion to the substance abuse the Commonwealth referred to." In addition, the trial judge emphasized that "we're at 118 in a 45 mile per hour zone. That's

- 8 -

something I don't know that this court has actually seen in fifteen years." He noted that the jury was presented with Beavers's poor driving history and her prior driving-related convictions, and he further noted that the jury "certainly heard about your son's situation, they heard about your health situation and they made the recommendation that they did." The trial judge reminded Beavers, "It was your right to ask that the jury fix the sentence in the case, you availed yourself of that right. And at the colloquy, I told you, you understand that if the jury finds you guilty, the jury will decide the sentence and you understood that." Finding no reason to modify or suspend the jury's recommended sentence, the trial court sentenced Beavers to 5 months of active incarceration and a $1,250 fine. Beavers appeals to this Court.

## II. ANALYSIS

### A. Striking Juror 23 for Cause

Beavers argues, "The trial court erred by denying to strike Juror Number 23 for cause." She contends that Juror 23 "affirmed that he would be more likely to believe testimony from a law enforcement witness" and that his "employment as a police officer casts reasonable doubt on his ability to be impartial." She further contends that Juror 23's responses during *voir dire* "demonstrated that his experience as a police officer would affect his ability to judge the credibility of law enforcement testimony," and she maintains that Juror 23 "was not rehabilitated" because "he merely assented to persuasive suggestions."

Whether a juror is sufficiently impartial "is a question of fact, and a trial court's decision to seat a juror is entitled to great deference on appeal." *Huguely v. Commonwealth*, 63 Va. App. 92, 121 (2014) (quoting *Lovos-Rivas v. Commonwealth*, 58 Va. App. 55, 61 (2011)); *see also Weeks v. Commonwealth*, 248 Va. 460, 475 (1994). The test "is whether the venireperson can lay aside the preconceived views and render a verdict based solely on the law and evidence presented at trial." *Id.* (quoting *Griffin v. Commonwealth*, 19 Va. App. 619, 621 (1995)). Because the trial court is

- 9 -

"able to see and hear each member of the venire respond to questions posed," it "is in a superior position to determine whether a prospective juror's responses during voir dire indicate that the juror would be prevented from or impaired in performing the duties of a juror as required by the court's instructions and the juror's oath." *Townsend v. Commonwealth*, 270 Va. 325, 329 (2005) (quoting *Green v. Commonwealth*, 262 Va. 105, 115 (2001)). For these reasons, the trial court's decision to retain or exclude a prospective juror "will not be disturbed on appeal unless there has been manifest error amounting to an abuse of discretion." *Id.* at 329-30 (quoting *Barrett v. Commonwealth*, 262 Va. 823, 826 (2001)). In making such a determination, we must consider the "entire voir dire, not just isolated portions." *Juniper v. Commonwealth*, 271 Va. 362, 401 (2006).

This Court has often stated that "*per se* rules of disqualification which are based on 'a presumption of [juror] bias or prejudice,' are disfavored in Virginia." *Bay v. Commonwealth*, 60 Va. App. 520, 531 (2012) (alteration in original) (quoting *McGann v. Commonwealth*, 15 Va. App. 448, 454 (1992)). Indeed, the Supreme Court has found that there is no *per se* disqualification rule for a prospective juror who has an association with a law enforcement officer, *see Clozza v. Commonwealth*, 228 Va. 124, 135 (1984), for a prospective juror who is a retired law enforcement officer, *see Gray v. Commonwealth*, 233 Va. 313, 338 (1987), or for a prospective juror who is a retired probation and parole officer, *see Strickler v. Commonwealth*, 241 Va. 482, 492 (1991). Although there are limited instances where the status of a prospective juror creates a *per se* disqualification, none of them applies here.[3]

---

[3] In *Townsend*, 270 Va. at 331, the Supreme Court found that *per se* disqualification applied when a prospective juror was a current client of counsel. The Supreme Court has also found that a stockholder in a company which is a party to the litigation would be *per se* disqualified from serving as a juror, *see Salina v. Commonwealth*, 217 Va. 92, 93-94 (1976), as would a prospective juror who is related within the ninth degree of affinity to the victim, *see Gray v. Commonwealth*, 226 Va. 591, 593 (1984).

Here, the entire venire indicated that they had no personal interest in the outcome of the case, that they had not obtained any information about the alleged offense, that they had not already expressed or formed an opinion about Beavers's guilt or innocence, and that they were unaware of any biases or prejudices against the parties. Although Juror 23, who was a law enforcement officer, initially indicated that he had "a positive opinion of law enforcement" and that he "might be more likely to believe testimony from a law enforcement witness," he clearly stated upon direct questioning that he "could follow the evidence and weigh their testimony as much as anybody else's." He responded in the affirmative to the comment, "So, if a law enforcement officer testifies, it would be your duty as a juror to evaluate that law enforcement officer's credibility the same way you would any other witness." In addition, Juror 23 twice answered in the negative when asked, "Do you believe that a law enforcement witness is inherently more credible than a civilian witness?" He also agreed in response to a question asked by Beavers's trial counsel that he could set aside his experience as a law enforcement officer when evaluating the evidence.

In short, the trial judge had the opportunity to observe Juror 23 and determine his "sincerity, conscientiousness, intelligence, and demeanor . . . first hand." *Juniper*, 271 Va. at 400. We defer to the trial court's assessment of Juror 23's "competency to serve impartially" because this finding was not plainly wrong or without evidence to support it. *Keepers v. Commonwealth*, 72 Va. App. 17, 44 (2020) (quoting *Garcia v. Commonwealth*, 60 Va. App. 262, 270 (2012)). Therefore, considering the *voir dire* in its entirety, we certainly do not find any manifest error amounting to an abuse of discretion regarding Juror 23's competency to serve on the jury.

B. Sufficiency of the Evidence

Beavers next argues,

> The trial court erred by denying the motion to strike the reckless driving charge where Lieutenant Diggs's testimony was inherently incredible and therefore the evidence was insufficient to prove Ms. Beavers was driving at a speed of 20 miles per hour or more in excess of the applicable maximum speed limit or in excess of 85 miles per hour.[4]

She contends that Lieutenant Diggs's testimony "that he paced Ms. Beavers going 120 miles per hour" was inherently incredible given "the short span of road that the two travelled and the brief time between when Lieutenant Diggs first observed Ms. Beavers and the stop." She further contends that it was inherently incredible that Lieutenant Diggs "was able to accurately pace Ms. Beavers at such extraordinary speeds" because "[a]t 120 miles per hour, it would have been extremely dangerous and difficult to simultaneously communicate over the radio and attempt to avoid a collision while checking one's speedometer three times in seven seconds."

The Supreme Court has often stated, "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). In such cases, a reviewing court "does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Perkins*, 295 Va. at 327 (emphasis in original) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). Instead, this Court must ask "whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (emphasis in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512

---

[4] "A person is guilty of reckless driving who drives a motor vehicle on the highways in the Commonwealth (i) at a speed of 20 miles per hour or more in excess of the applicable maximum speed limit or (ii) in excess of 85 miles per hour regardless of the applicable maximum speed limit." Code § 46.2-862.

(2017)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

"The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." *Gerald*, 295 Va. at 486 (quoting *Elliott v. Commonwealth*, 277 Va. 457, 462 (2009)). It is well-settled that "the conclusions of the fact finder on issues of witness credibility may be disturbed on appeal only when we find that the witness' testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Ashby v. Commonwealth*, 33 Va. App. 540, 548 (2000) (quoting *Fisher v. Commonwealth*, 228 Va. 296, 299 (1984)). However, the Supreme Court has noted, "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald*, 295 Va. at 487 (quoting *Juniper*, 271 Va. at 415). "A legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness' testimony or statements. Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019) (citing *Juniper*, 271 Va. at 415). Consequently, "'[p]otential inconsistencies in testimony are resolved by the fact finder,' not the appellate court." *Id.* (alteration in original) (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011)).

In this case, Lieutenant Diggs's testimony simply was not inherently incredible as a matter of law, and Beavers points to nothing in the record before this Court on appeal that shows Lieutenant Diggs's testimony to be false. Lieutenant Diggs testified that when he saw Beavers's Mustang drive by his unmarked patrol vehicle, "the rear of the vehicle squats, which indicates to

me that the vehicle is accelerating at a fast rate of speed." He noted that the Mustang drove by an unobstructed road sign indicating that the posted speed limit was 45 miles per hour. He recalled that Beavers's "vehicle then moved into the opposing lane of traffic and from there adjusted to the center of the road and then back into the correct lane of travel." Lieutenant Diggs testified that he immediately responded "by increasing in speed, talking over the radio, I have a reckless driver." As he accelerated to catch up to Beavers's vehicle, he began to pace her to determine the speed of her vehicle, and he observed that her vehicle reached speeds of 114 miles per hour, then 118 miles per hour, and finally 120 miles per hour before she suddenly decelerated and stopped her vehicle. In addition to Lieutenant Diggs's uncontroverted testimony, the Commonwealth also entered into evidence certificates of calibration for the speedometer and the radar tuning fork on Lieutenant Diggs's unmarked patrol vehicle that he was driving when he initiated the traffic stop on Beavers's Mustang.

In short, the elements for the reckless driving offense were clearly established by Lieutenant Diggs's testimony and the Commonwealth's other evidence. Given that Lieutenant Diggs's testimony was not inherently incredible as a matter of law, we certainly cannot say that no rational factfinder could have found the evidence sufficient to sustain Beavers's conviction for reckless driving beyond a reasonable doubt.

## C. Sentencing

Beavers finally argues, "The trial court erred by refusing to modify or suspend, either in whole or in part, the jury's five-month sentence for reckless driving." She contends that "the trial court underweighted Ms. Beavers's account, suggesting that her story was contradicted by the very evidence that confirmed it." She further contends that the trial court "improperly penalized Ms. Beavers for her decision to seek a jury trial and jury sentencing."

"We review the trial court's sentence for abuse of discretion." *Scott v. Commonwealth*, 58 Va. App. 35, 46 (2011). A trial court can abuse its discretion in three principal ways: "when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." *Everett v. Tawes*, 298 Va. 25, 40 (2019) (quoting *Landrum v. Chippenham & Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352 (2011)). However, the Supreme Court has made clear that "when a statute prescribes a maximum imprisonment penalty and the sentence does not exceed that maximum, the sentence will not be overturned as being an abuse of discretion." *Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016) (quoting *Alston v. Commonwealth*, 274 Va. 759, 771-72 (2007)).

"Virginia law provides that a defendant whose guilt is determined by the jury will have the sentence decided by the court unless the defendant elects before trial for the jury to determine the sentence as well." *Henderson v. Commonwealth*, 77 Va. App. 250, 255-56 (2023) (citing Code §§ 19.2-295(A), 19.2-295.1). Where a defendant elects sentencing by jury, upon finding the defendant guilty, "a separate proceeding limited to the ascertainment of punishment shall be held as soon as practicable before the same jury." Code § 19.2-295.1. However, the sentence recommended by the jury in that proceeding "is not final or absolute, since its finding on the proper punishment is subject to suspension by the trial judge, in whole or in part, on the basis of any mitigating facts that the convicted defendant can marshal." *Duncan v. Commonwealth*, 2 Va. App. 342, 345 (1986) (quoting *Vines v. Muncy*, 553 F.2d 342, 349 (4th Cir.), *cert. denied*, 434 U.S. 851 (1977)), *superseded in part by statute*, Code § 19.2-295.2, *as recognized in Allard v. Commonwealth*, 24 Va. App. 57, 68 (1997); *see also Rock v. Commonwealth*, 76 Va. App. 419, 427 n.7 (2023) (noting that, under the current sentencing model, a trial court still has the power to

- 15 -

suspend a sentence and impose probation).  This Court has explained that "the procedures outlined in Code § 19.2-295.1 for the jury's ascertainment of punishment" are

> subject to (1) the provisions of [Code] § 19.2-295, which require the jury's sentence to be "within the limits prescribed by law"; (2) the provisions of [Code] § 19.2-295.2, which permit the trial court to impose a suspended term of incarceration and post-release supervision when the jury's sentence includes an active term of incarceration; and (3) the provisions of Code § 19.2-303, which permit the trial court to suspend some or all of a sentence and impose probation.

*Boyd v. Commonwealth*, 28 Va. App. 537, 542 (1998).  "By vesting the trial court with discretionary authority to suspend or modify the sentence imposed by the jury, the legislature intended to leave the consideration of mitigating circumstances to the court." *Runyon v. Commonwealth*, 29 Va. App. 573, 579 (1999) (quoting *Duncan*, 2 Va. App. at 345).

In this case, there is no dispute that the sentence the trial court imposed — 5 months of active incarceration and a $1,250 fine — was within the statutory range set by the General Assembly.  *See* Code §§ 18.2-11(a), 46.2-862, 46.2-868(A).  In addition, the record before this Court on appeal is clear that the trial court, in determining Beavers's sentence, considered the evidence presented at the guilt phase of the jury trial, the mitigating evidence and the aggravating evidence presented at the sentencing phase of the jury trial, and the mitigating evidence and the aggravating evidence presented at the sentencing hearing before the trial court.  The trial judge expressly told Beavers, "The Court certainly doesn't make light of your son's situation." However, the trial judge found that Beavers's explanation for her excessive speed was not credible because it stemmed from a Facebook post made the day *before* the traffic stop, as well as from medical records from the day *after* the traffic stop.  The trial judge pointed out that the medical records alluded to substance abuse as the cause of her son's hospitalization.  Furthermore, the trial judge opined that Beavers was traveling "118 in a 45 mile per hour zone.  That's something I don't know that this court has actually seen in fifteen years."  The trial judge also noted that the jury was

- 16 -

presented with Beavers's poor driving history and her prior driving-related convictions — and that the jury "certainly heard about your son's situation, they heard about your health situation and they made the recommendation that they did."

The Supreme Court has recognized, "Criminal sentencing decisions are among the most difficult judgment calls trial judges face." *Minh Duy Du*, 292 Va. at 563. "Because this task is so difficult, it must rest heavily on judges closest to the facts of the case — those hearing and seeing the witnesses, taking into account their verbal and nonverbal communication, and placing all of it in the context of the entire case." *Id.* There is no indication that the trial court here did not consider Beavers's mitigating evidence or that it considered any irrelevant or improper factors. Rather, the trial court clearly imposed a sentence that, in its sound discretion, it determined to be just — and that was within the statutory range for reckless driving. Consequently, we certainly cannot say that the trial court abused its broad sentencing discretion in imposing the jury's recommended sentence.

### III. CONCLUSION

In short, the trial court did not abuse its discretion in refusing to strike Juror 23 for cause. The trial court also did not abuse its discretion in imposing the sentence recommended by the jury. Furthermore, the trial court was not plainly wrong in denying Beavers's motion to strike as a rational factfinder could certainly determine that the evidence was sufficient to find Beavers guilty of reckless driving. Therefore, for all of the foregoing reasons, we affirm the trial court's judgment, and we uphold Beavers's conviction.

*Affirmed.*